ORAL ARGUMENT NOT YET SCHEDULED

Nos. 15-5016 & 15-5017

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHRISTOPHER VAN HOLLEN, JR.,
*Plaintiff-Appellee*,

v.

FEDERAL ELECTION COMMISSION,
*Defendant-Appellee*,

CENTER FOR INDIVIDUAL FREEDOM,
*Intervenor-Defendant-Appellant*,

HISPANIC LEADERSHIP FUND,
*Intervenor-Defendant-Appellant*,

*On Appeal from the United States District Court for the District of Columbia*
*No. 1:11-cv-00766-ABJ (Hon. Amy Berman Jackson)*

REPLY BRIEF OF APPELLANT HISPANIC LEADERSHIP FUND

Dated: May 26, 2015

Jason Torchinsky (D.C. Bar No. 976033)
Michael Bayes (D.C. Bar No. 501845)
Shawn Sheehy
HOLTZMAN VOGEL JOSEFIAK PLLC
45 North Hill Drive
Suite 100
Warrenton, VA 20186
(540) 341-8808
Attorneys for Hispanic Leadership Fund

## **<u>TABLE OF CONTENTS</u>**

Page

TABLE OF AUTHORITIES ........................................................................ ii

STATUTES AND REGULATIONS ......................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................1

    I.    THE FEC'S ELECTIONEERING COMMUNICATION DISCLOSURE REGULATION IS COMPATIBLE WITH CONGRESS'S GOALS ........................................................................3

    II.    THE FEC HAD SUFFICIENT EVIDENCE TO MAKE A PREDICTIVE JUDGMENT .............................................................13

    III.    THE SEPARATE SEGREGATED FUND IS NOT A VIABLE OPTION ................................................................................20

    IV.    THE COMMISSION SOUGHT TO PRESERVE THE CONSTITUTIONALITY OF THE STATUTE................................ 21

CONCLUSION ......................................................................................24

CERTIFICATE OF COMPLIANCE.......................................................25

CERTIFICATE OF SERVICE ..............................................................26

# TABLE OF AUTHORITIES

## CASES

*Cases chiefly relied upon*

*AFL-CIO v. FEC*,
   333 F.3d 168 (D.C. Cir. 2003)....................................................................20, 21

*AT&T Corp. v. Iowa Utilities Board*,
   525 U.S. 366 (1999)..................................................................................4, 9

*Agape Church, Inc. v. FCC*,
   738 F.3d 397 (D.C. Cir. 2013)..................................................................14, 15

*American Public Communs. Council v. FCC*,
   215 F.3d 51 (D.C. Cir. 2000).........................................................................17

*Bismullah v. Gates*,
   551 F.3d 1068 (D.C. Cir. 2009).................................................................. 12-13

*Bowman Transport, Inc. v. Arkansas- Best Freight System, Inc.*,
   419 U.S. 281 (1974)....................................................................................19

*Citizens United v. FEC*,
   530 F. Supp. 2d 274 (D.D.C. 2008)..............................................................22

*Citizens United v. FEC*,
   558 U.S. 310 (2010)................................................................................20, 22

*Continental Air Lines, Inc. v. Department of Transport*,
   843 F.2d 1444 (D.C. Cir. 1988)..............................................................4, 7, 9

*Ctr. for Individual Freedom v. Van Hollen*,
   694 F.3d 108 (D.C. Cir. 2012).................................................3, 4, 8, 9, 10, 21

*Dart v. United States*,
   961 F.2d 284 (D.C. Cir. 1992).......................................................................13

*FEC v. Mass. Citizens for Life, Inc., (MCFL')*,
   479 U.S. 238 (1986)..............................................................2, 10, 15, 18, 20

*FEC v. Wis. Right to Life, Inc., (WRTL II')*,
    551 U.S. 449 (2007)...............................................................2, 10, 17, 18, 19

*Kapral v. United States*,
    166 F.3d 565 (3d Cir. 1999) .............................................................8

*Marx v. General Revenue Corp.*,
    133 S. Ct. 1166 (2013)......................................................................8

*McConnell v. FEC*,
    540 U.S. 93 (2003).........................................................3, 10, 18, 22

*McConnell v. FEC*,
    No. 02-0582 (D.D.C.) ......................................................................6

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014)...................................................................21

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) .........................................................16

*National Shooting Sports Foundation, Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013)......................................................8, 9

*Nuvio Corp. v. FCC*,
    473 F.3d 302 (D.C. Cir. 2006)..........................................13, 17, 19

*Rust v. Sullivan*,
    500 U.S. 173 (1991)..................................................................10, 19

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005).........................................................11

*Sorenson Communications Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)..........................................  13-14, 19

## STATUTES AND REGULATIONS

52 U.S.C. § 30104(f)(2)(F) ...........................................................6

52 U.S.C. § 30101(8) ..................................................................6

11 C.F.R. 104.20(c)(1-6)...........................................................5, 12

## UNITED STATES CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. I ...............................................................3, 20

## BILLS

H.R. 5175, 111th Cong. § 211(b)(1)(B) (2010)......................................13

S.229, 114th Cong., § 2(b)(1)(a)(2)(F) (2015) ......................................13

S. 2219, 112th Cong., § 324(a)(2)(B) (2012) .......................................13

S. 2516, 113th Cong., § 2(b)(1)(a)(2)(F) (2014) ....................................13

S. 3295, 111th Cong., § 211(b)(2) (2010) ...........................................13

S. 3369, 112th Cong., § 324(a)(2)(B) (2012) .......................................13

## OTHER AUTHORITIES

Brief for Family Research Council *et al.* as *Amicus Curiae* Supporting Appellee;
    *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007)
    (Nos. 06-969 & 06-970) ..................................................................18

Brief for Appellee;
    *Citizens United v. FEC*, 558 U.S. 310 (2010), No. 08-205 ...........................22

Brief of Government Defendants,
    *McConnell v. FEC*, No. 02-0582 (D.D.C.) ...................................... 6-7

Final *McConnell* District Court Brief of BCRA Congressional Sponsors,
Defendant-Interveners, *McConnell v. FEC*, No. 02-0582 (D.D.C.)........................6

Opening *McConnell* District Court Brief of BCRA Congressional Sponsors, Defendant-Interveners, *McConnell v. FEC*, No. 02-0582 (D.D.C.).........................7

# GLOSSARY OF ABBREVIATIONS

**AFL-CIO:**    **American Federation of Labor-Congress of Industrial Organizations**

**BCRA:**    **Bipartisan Campaign Reform Act**

**CFIF:**    **Center For Individual Freedom**

**FECA:**    **Federal Election Campaign Act**

**FEC:**    **Federal Election Commission**

**HLF:**    **Hispanic Leadership Fund**

**IRS:**    **Internal Revenue Service**

**JA:**    **Joint Appendix**

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Center for Individual Freedom's ('CFIF') opening brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

1. The FEC's electioneering communication disclosure regulation is compatible with, and fulfills, Congress's goals and expectations. The term 'contribution' contains a purpose element and disclosure is required of those "contributors who contributed" $1,000 or more annually. BCRA's sponsors, both before and after enacting the electioneering communication disclosure statute, intended the statute to contain a purpose element that parallels the disclosure obligations imposed by the independent expenditure disclosure statute.

2. Appellee contends that Congress intended broader disclosure for electioneering communications than for independent expenditures when it enacted BCRA. But courts must not attempt to divine the broad purposes of the statute because doing so risks unraveling legislative compromises and converting those who largely lost in legislation to victors in litigation.

3. Appellee's reliance on the *Russello* cannon of statutory interpretation in this *Chevron* Step II context fails because this Court ruled that the statute is susceptible to multiple interpretations.

1

4. The FEC's 2003 rulemaking is of no import here because the statute prohibited all corporations from using their general treasury funds to make electioneering communications. Only a relatively small number of non-profit corporations ever satisfied the *MCFL* exception[1] and used their general treasury funds for political speech.   Comparing the two rulemakings neglects the "complicated situation" that faced the FEC after the Supreme Court's ruling in *FEC v. Wis. Right to Life, Inc*., ('*WRTL II*') 551 U.S. 449 (2007).

5. The FEC had sufficient evidence to make a predictive judgment that its disclosure regulation would be costly and burdensome. Appellee contends that HLF did not provide facts or examples demonstrating that the FEC had evidence for its judgment. HLF adduced at least two examples demonstrating that the FEC's proposed disclosure regulation was more costly than disclosure to the Department of Labor for labor unions or the IRS for non-profits. This evidence was uncontroverted. This Court must accord the FEC deference for its predictive judgment.

6. The FEC credited the labor unions' concern that the segregated fund option was not a meaningful alternative because it exacts a prohibitive burden and

---

[1] The MCFL exception comes from the Supreme Court's ruling in *FEC v. Mass. Citizens for Life, Inc*., ('*MCFL*') 479 U.S. 238 (1986).

cost on the exercise of First Amendment rights.

7. The *McConnell* and *Citizens United* Courts upheld the constitutionality of the electioneering communication disclosure statute. BCRA's sponsors, the Government Defendants in *McConnell* and the *Citizens United* three-judge district court, and the Solicitor General all informed various courts that the electioneering communication disclosure provision imposed the same obligations as the independent expenditure statute, requiring disclosure only of those contributions earmarked for the purpose of furthering the communication. Therefore the FEC acted reasonably when it acted to preserve the constitutionality of the regulation.

## I.   THE   FEC'S   ELECTIONEERING   COMMUNICATION DISCLOSURE   REGULATION   IS   COMPATIBLE   WITH CONGRESS'S GOALS.

This Court ruled that Congress did not speak plainly when it drafted BCRA's electioneering communication disclosure statute. *See Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108, 110 (D.C. Cir. 2012); *cf. McConnell v. FEC*, 540 U.S. 93, 211 (2003) (reading *MCFL* exception into statute despite statute prohibiting all corporations from speaking).  This Court held that the electioneering communication statute "[i]s anything but clear..." and especially so when viewed in the light of the Supreme Court's decisions in *WRTL II* and *Citizens United. Van Hollen*, 694 F.3d at

110.   This Court also rejected the district court's holding that the terms 'contributor' and 'contributed' "cannot be construed to include a 'purpose' requirement..." *Id*.

Importantly, this Court found that Congress did not have an intention on the precise question at issue. *Id*. at 111. Indeed, this Court considered it "doubtful" that Congress anticipated the "complicated situation" that faced the FEC in 2007, when the very groups the statute previously explicitly prohibited from speaking—most corporations, including non-profits, labor unions—were, once again, permitted to speak. *Id*. Thus, "[C]ongress' specific intent on the question at hand has eluded the reviewing court." *Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444, 1449 (D.C. Cir. 1988). The Court has therefore cautioned that when attempting to divine the purpose of Congress at *Chevron* Step II, courts must conduct their analysis "[w]ith assiduous care [to avoid] judicial unwinding of deals struck in Congress." *Id*. at 1451. Accordingly, courts must uphold an agency's regulation where it is "[r]*ationally* related to the goals of the Act." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999) (emphasis added).

As HLF previously demonstrated, the FEC's electioneering communication disclosure regulation is rationally related to BCRA's goals because:

4

1. Legislative history demonstrates that Congress desired disclosure only of those donors who donated $1,000 or more annually with the purpose of funding the electioneering communication; (HLF Br. 21);[2]

2. BCRA's sponsors maintained this position during the *McConnell* litigation; (HLF Br. 40, 54);

3. A bipartisan group of commenters believed Congress intended a purpose element; (HLF Br. 54) (JA-243-44) (Michael Trister); (JA-152-54) (Alliance for Justice);

4. Contrary to Appellee's position, the FEC's disclosure regulation demands the disclosure of a substantial amount of information about the speaker; 11 C.F.R. 104.20(c)(1-6); (HLF Br. 55).

5. On five occasions, Congress has considered and rejected proposals to amend the electioneering communication disclosure statute to change the FEC's regulation; (HLF Br. 56);

6. Congress did not intend disclosure broader than what is required for independent expenditures; (HLF Br. 56);

To Appellee, the FEC's electioneering communication disclosure regulation is unreasonable for three reasons. This Court should reject all of these arguments.

---

[2] Citations of briefs are to the ECF generated page numbers.

*First*, Appellee contends that the FEC's disclosure regulation is unreasonable because Congress's electioneering communication disclosure statute did not include the 'purpose' language that is contained in the independent expenditure disclosure statute. (Opp'n. Br. 41-42).

Rather, Congress required the disclosure of *all persons* who *contributed* $1,000 or more annually. 52 U.S.C. § 30104(f)(2)(F). The term 'contribution' is a statutorily-defined term of art that contains a purpose element. *See id*. § 30101(8)(A)(i). In the aftermath of *WRTL II*, the FEC reasonably interpreted Congress's use of the phrase "contributor who contributed" to include a purpose element.

Statements from congressional sponsors, both prior to and after the enactment of the electioneering communication disclosure statute, support the FEC's interpretation. *See* (HLF Br. 21-22) (citing Senator Snowe's statements, including that the statute requires disclosure of large contributions *designated* for such ads); *see also* Brief of Government Defendants at 174, *McConnell v. FEC*, No. 02-0582 (D.D.C.) (describing the disclosure statute as modest and imposing the same disclosure obligations as required with independent expenditures);[3] Final *McConnell* District Court Brief of BCRA Congressional Sponsors, Defendant-Interveners at I-85

---

[3] The Brief of Government Defendants is located at http://campaignfinance.law.stanford.edu/case-materials/mcconnell-v-fec/ and is at Government Defendants': Brief of Defendants – Part 11.

n.320 (adopting Brief of Defendants at 174);[4] Opening *McConnell* District Court Brief of BCRA Congressional Sponsors, Defendant-Interveners at I-76 (describing the electioneering communication disclosure statute as imposing the same types of rules that FECA has long imposed on independent expenditures).[5] Commenters also thought Congress intended a purpose element for disclosure of electioneering communications.  (JA-153, 243-44); (HLF Br. 54).

Appellee contends that Congress intended disclosure broader than what Congress required of independent expenditures. (Opp'n. Br. 44-45). But this Court has previously cautioned that courts cannot become anti-democratic agents where "[c]arefully wrought compromises on Capitol Hill may be torn asunder in federal courthouses." *Continental Air Lines*, 843 F.2d at 1450.  This risks transforming congressmen who largely lost in the congressional debates into the ultimate victors in litigation. *Id*. This is why courts cannot "resort to a single 'broad purpose'" or goals to drive the interpretive process. *Id*. at 1451.

Appellee attempts to shoehorn his statutory argument into the *Russello* cannon of statutory interpretation that Congress acts intentionally when it includes language in one section of a statute and excludes it in another.  (Opp'n. Br. 42). A statutory

---

[4] *Available at* http://www.democracy21.org/archives/key-documents-archives/court-cases-opinions-and-briefs/mcconnell-v-fec/briefs-filed-with-district-court-by-bcra-congressional-sponsors-defending-bcra/

[5] *Id*. at supra n.4.

7

cannon is not a rule, however, but merely an indication of meaning that must yield where contrary indications are present. *See Kapral v. United States*, 166 F.3d 565, 579 (3d Cir. 1999) (Alito, J., concurring).

More fundamentally, the *Russello* cannon is limited and applies only when the statute at issue has a single, obvious meaning and is not susceptible to multiple interpretations. *See id*. The *Russello* cannon presumes "careful draftsmenship" in statutes. *Id*. But the electioneering communication disclosure statute is "anything but clear" and is susceptible to multiple interpretations. *Van Hollen*, 694 F.3d at 110.

Additionally, the D.C. Circuit uses the *Russello* cannon interchangeably with the *expressio unius est exclusio alterius* cannon. *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 211 (D.C. Cir. 2013). The Supreme Court limits the application of the *expressio unius* cannon to those situations where "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp*., 133 S. Ct. 1166, 1175 (2013). This is not the case here. In fact, Senator Snowe *intended* the disclosure statute to contain a purpose element. *See* (HLF Br. 21-22, *supra* at 6). Additionally, Appellee cannot rely on the *expressio unius* cannon because it cannot be ascertained whether Congress said 'no' to including a purpose element. *See Van Hollen*, 694 F.3d at 111 (Congress did not have an intention on precise question).

8

Finally, at *Chevron* Step II the *expressio unius* cannon is a feeble interpretive aid. *See Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 211. This is especially true here because Congress could not have anticipated the circumstances facing the FEC after the *WRTL II* decision. *See Van Hollen*, 694 F.3d at 111. The FEC therefore was required to fill the resulting gap in a statute that was anything but clear. *See id.*

The fact that Congress did not copy its independent expenditure disclosure statute and paste it into the electioneering communication disclosure statute does not mean that Congress intended broader disclosure for electioneering communications. Rather, the purpose element is contained in the definition of 'contribution,' as is reflected in both the pre and post-enactment statements from congressional sponsors; and the commenter's comments during the FEC's rulemaking demonstrates that the FEC interpreted Congress's electioneering disclosure statute in a manner that is compatible with the goals of Congress, or, at the very least, rationally related to the goals of Congress. *See Continental Air Lines,* 843 F.2d at 1453; *AT&T Corp.*, 525 U.S. at 388.

*Second*, Appellee contends that the disclosure regulation is unreasonable because the 2003 FEC regulation did not include a purpose element. (Opp'n. Br. 43). The 2003 rulemaking is irrelevant here.

The 2003 rulemaking involved a statute that prohibited corporations, including non-profit corporations, and labor unions from using their general treasury funds to

9

make electioneering communications. The only incorporated entities that could lawfully make electioneering communications were *qualified* non-profit corporations. *See WRTL II*, 551 U.S. at 455-57; *McConnell*, 540 U.S. at 211; *FEC v. Mass. Citizens for Life, Inc*., ('*MCFL*') 479 U.S. 238, 263-64 (1986) (narrowly defining *qualified* nonprofit corporations). This is why the *WRTL II* decision presented the FEC with a "complicated situation" requiring a recalibration of the electioneering communication regime to accommodate the many entities that Congress intended to prohibit from speaking. *See Van Hollen*, 694 F.3d at 111; *See Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991) (holding that an agency must be given ample latitude to adapt its rules to changing circumstances). Comparing disclosure considerations in 2003 to 2007 is an exercise in comparing apples to oranges.

*Third*, Appellee contends that the disclosure regulation is unreasonable because legislative history demonstrates that BCRA was a departure from the old campaign finance regime and thus Congress would not have adopted a standard that was ineffective and "flouts" the purpose of BCRA. (Opp'n. Br. 33 and 38). According to Appellee, adopting the old standard enacts a provision that enables "massive evasion" of the disclosure requirements as evidence by the decrease in disclosure of contributions; (Opp'n. Br. 34, 36-37, 39-40).

HLF previously demonstrated that BCRA's sponsors, both before and after BCRA's passage, intended the disclosure provision to be modest, only requiring

disclosure of those contributors whose "[l]arge contributions were designated for such ads," and to parallel the independent expenditure disclosure statute. (HLF Br. 21-22, 40, *supra* at 6-7). HLF demonstrated that the legislative comments that Appellee and the district court rely on do not contradict these other comments. (HLF Br. 22). Appellee still does not adduce any legislative comment that contradicts these comments from BCRA's sponsors.

Appellee also contends that BCRA was a major departure from FECA's "ineffective" disclosure regime and therefore BCRA's sponsors did not intend to adopt the independent expenditure disclosure standard. (Opp'n. Br. 44).[6] But BCRA's sponsors claimed that the two disclosure statutes imposed the same requirements. (HLF Br. 21-22, 40, *supra* at 6-7).

Appellee's assertion of "massive evasion" of the disclosure requirements is hyperbole. (Opp'n. Br. 36 and 56).[7] Appellee, however, does not address HLF's

---

[6] For this proposition and the proposition that BCRA's primary purpose was to "[i]mprove disclosure of the sources of funding for campaign ads..." Appellee relies on *Shays v. FEC*, 414 F.3d 76, 81-82 (D.C. Cir. 2005) (Opp'n. Br. 38, 44). Those citations, however, contain no mention of disclosure. Rather, those pages discuss that BCRA was intended to capture sham issue ads and soft money spending.

[7] Appellee contends that the FEC's disclosure regulation violates *State Farm* because the FEC did not consider the risk that by taking a narrow approach to disclosure, this would lead to "a proliferation of issue ads by entities with misleading names." (Opp'n. Br. 56-57). But the comments Appellee relies upon (JA-43, 114, 118), as well as the comments cited at (Opp'n. Br. 24 n.7), were urging the FEC to adopt Alternative 1 and reject Alternative 2 which exempted electioneering communications from the disclosure requirements *entirely*. Ultimately, the FEC

point that the public still receives substantial information about the speaker, including who "actually paid" for the advertisement. *See* (HLF Br. 55) (citing 11 C.F.R. § 104.20(c)(1-6)). Appellee also fails to address the First Amendment harm imposed when the FEC's disclosure regulation was vacated in 2012. *See* (HLF Br. 44-45).

Moreover, Appellee claims that the independent expenditure disclosure requirement is more demanding than the electioneering communication statute. (Opp'n. Br. 44-45). But Appellee focuses merely on the dollar threshold—$200 for independent expenditures and $1,000 for electioneering communications. What is burdensome is not the amount, but the burden of compiling all of the names, addresses, and amounts of each professor, doctor, dentist, airline pilot, and screen actor guild member, and other labor union members whose membership dues exceed $1,000 annually. Appellee wants all of this for speech that is by definition non-electoral. (JA-163, 228, 311); (HLF Br. 56).

Finally, Appellee contends that HLF's reliance on *Bob Jones University v. United States* is misplaced. (Opp'n. Br. 44 n.17). Legislative inaction is probative where congressional inaction is long-standing and where Congress considered and failed to act on the precise issue before the court. *See Bismullah v. Gates*, 551 F.3d

---

adopted Alternative 1, requiring the disclosure of several pieces of information, preventing the speaker from hiding behind misleading names. *See* 11 C.F.R. § 104.20(c)(1-6); (JA-311).

1068, 1074 (D.C. Cir. 2009).  Both before and after Appellee brought this lawsuit in 2011, Appellee himself attempted to amend BCRA to impose by legislation the disclosure regime Appellee now seeks by litigation. (HLF Br. 56). Congress has since failed to pass the DISCLOSE Act at least five additional times.[8] Congress has therefore rejected Appellee's interpretation. *See Dart v. United States*, 961 F.2d 284, 286 (D.C. Cir. 1992).

## II.    THE FEC HAD SUFFICIENT EVIDENCE TO MAKE A PREDICTIVE JUDGMENT.

Approximately 15 million labor union members and several non-profit corporations, entities that could not speak prior to *WRTL II*, provided the Commission with sufficient uncontroverted evidence of burden and cost. *See, e.g.,* (JA-153 n.8, 156 n.1, 143, 163, 311); (HLF Br. 36). The FEC also had evidence that individuals who donate $1,000 or more annually to labor union membership dues and to non-profit corporations do not necessarily support the recipient's electioneering communications. (JA-153-54, 163, 311) (HLF Br. 19-20). The FEC made a valid predictive judgment based on uncontroverted evidence and its judgment is entitled to "[p]articularly deferential treatment." *See Nuvio Corp. v. FCC*, 473 F.3d 302, 306-07 (D.C. Cir. 2006); *Sorenson Communications Inc. v. FCC*, 755

---

[8] *See* S.229, 114th Cong. § 2(b)(1)(a)(2)(F) (2015); S. 2516, 113th Cong. § 2(b)(1)(a)(2)(F) (2014); S. 2219, 112th Cong. § 324(a)(2)(B) (2012); S. 3369, 112th Cong. § 324(a)(2)(B) (2012); S. 3295, 111th Cong.  § 211(b)(2) (2010); H.R. 5175, 111th Cong. § 211(b)(1)(B) (2010).

F.3d 702, 708 (D.C. Cir. 2014); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 405-06, 410 (D.C. Cir. 2013) (holding that FCC did not abuse its discretion when it changed its downconverting rule to permit cable operators to provide conversion equipment to customers based on uncontroverted evidence from a trade association that cable operators were providing the equipment at minimal or no cost).

*First*, Appellee contends that the FEC lacked evidence that contributors who contributed $1,000 or more annually might disagree with the recipient's electioneering communications. (Opp'n. Br. 48). Appellee, however, never addresses the labor union and non-profit comments that adduced evidence demonstrating that donors do not necessarily support the recipient's electioneering communications. (HLF Br. 49-50).

The labor unions were rightly concerned that if the FEC adopted Alternative 1, its membership dues would constitute 'donations' because that term is broadly defined to include gifts, subscriptions, loans, and anything of value. (JA-163). If dues were considered donations that would trigger the FEC's disclosure requirements demanding disclosure of union members' names and addresses. (JA-163, 228). The labor unions therefore informed the FEC that these membership dues had no "meaningful relationship" to the unions' electioneering communications and disclosure of those names would be misleading. *See* (JA-163); *see also* (JA-153-54) (Alliance for Justice stating that disclosure of all sources of revenue for a non-profit

14

is misleading and that the non-profit lost grants because the potential for disclosure). Appellee fails to cite record evidence to refute this evidence. The FEC therefore properly credited the uncontroverted evidence. (JA-311); *Agape Church*, 738 F.3d at 410.

*Second*, Appellee contends that it is doubtful that any such evidence exists. (Opp'n. Br. 48-49) (relying on *MCFL*, 479 U.S. at 261). Appellee's reliance on *MCFL* is misplaced and misleading. The cited language in *MCFL* does not address contributions to any non-profit organization. Rather, the Court wrote "Individuals who contribute *to appellee* are fully aware of its political purposes." *Id*. at 260. (emphasis added) Thus, the Court's discussion addressed whether the broad prohibition against the use of corporate (or labor union) general treasury funds was narrowly tailored in the very narrow case of an organization such as MCFL.

*Third*, and relatedly, Appellee contends that the FEC misapprehends the purpose of disclosure, namely to permit citizens to react appropriately to speech. (Opp'n. Br. 49-50). But this argument does not address HLF's, the labor unions', and the Alliance for Justice's concern that disclosure of all donors who donated $1,000 or more annually is misleading to the public. (JA-153, 163). This undermines the very interest Appellee advances, namely, it hinders the public's effort to discern what import to give an entity's speech. *See* (JA-163, 311). Such disclosure also disserves

15

First Amendment principles. (JA-160); *see, e.g., Minnesota Citizens Concerned for Life, Inc. v. Swanson,* 692 F.3d 864, 876-77 (8th Cir. 2012).

*Fourth*, Appellee contends that the Commission had no evidence concerning the costs of compliance; what those costs might entail; that it would be very costly to identify donors aggregating $1,000 or more annually; and that HLF relied on conclusory statements that did not provide any *facts* or *examples*. (Opp'n. Br. 50-53).

As was stated previously, (HLF Br. 47-49), however, the FEC did have uncontroverted evidence from approximately 15 million labor union members, 60 labor union organizations, and a representative of non-profit organizations that the proposed disclosure regime would be costly and burdensome. (JA- JA-153 n.8, 156 n.1, 163, 206, 311). The labor unions explained how compliance with the proposed regulation would be more costly and burdensome than the Department of Labor's disclosure requirements. (JA-163-64, 311). For non-profit organizations, the proposed disclosure regulation was far broader than what the IRS required on its Form 990. (JA-153 n.1, 311) (noting that the Form 990 only requires the disclosure of those donors who donated $5,000 or more annually). These are two uncontroverted examples. These are two uncontroverted facts. The labor unions also provided another example whereby the FEC's proposed regulation might require disclosure of a local union's membership because they paid $150 a week for a radio show. (JA-207). Furthermore, both labor unions and non-profits explained that the

16

burdens in identifying who must be disclosed would be enormous. (JA-153 n.8,163, 206, 311); (HLF Br. 31-33).

Since labor unions and corporations could not use their general treasury funds to make electioneering communications prior to *WRTL II*, the FEC was forced to make a predictive judgment concerning the compliance costs of its proposed regulation. *See WRTL II*, 551 U.S. at 455-57. The labor unions and the Alliance for Justice provided uncontroverted evidence that is sufficient for the FEC to make the predictive judgment that imposing its proposed disclosure regulation would have been costly and burdensome. *American Pub. Communs. Council v. FCC*, 215 F.3d 51, 56 (D.C. Cir. 2000) (holding that an agency is not required to enter precise predictive judgments where the commenters have not so provided); *Nuvio Corp.* 473 F.3d at 306-07; (HLF Br. 48-49).

*Fifth*, Appellee engages in a sleight of hand by equating *qualified* nonprofit corporations with non-profits like Wisconsin Right to Life and Alliance for Justice. (Opp'n. Br. 50). From this false premise, Appellee contends that the FEC had no evidence that compliance with the 2003 version of the disclosure regulation was costly or burdensome for—among others—*qualified* non-profit corporations (Opp'n. Br. 50).

As stated *supra* and at HLF Br. 22, the 501(c)(4) non-profit corporation Wisconsin Right to Life was prohibited from using its general treasury funds to make

electioneering communications. *See WRTL II*, 551 U.S. at 455-57. While the Supreme Court in *McConnell* read the *MCFL* exception into BCRA's electioneering communication provisions permitting *qualified* non-profit corporations to use general treasury funds to make electioneering communications, Wisconsin Right to Life did not qualify for that exception. *McConnell*, 540 U.S. at 211; *WRTL II*, 551 U.S. at 455-57.

There is a significant distinction between qualified non-profit corporations and regular non-profit corporations. Non-profit corporations like Wisconsin Right to Life, Alliance for Justice, and HLF, are permitted to accept corporate donations whereas *qualified* non-profit corporations are not. *See MCFL*, 479 U.S. at 264. Thus, Wisconsin Right to Life, HLF, and Alliance for Justice could not use its general treasury funds prior to *WRTL II*.

This further demonstrates the seismic shift that *WRTL II* caused in 2007 where non-profit corporations, for-profit corporations, and labor unions could now do what BCRA prohibited them from doing, namely, using general treasury funds to make electioneering communications. Between 2003 and 2007 only *fourteen* entities making electioneering communications qualified for the *MCFL* exception.[9]

---

[9] *See* Brief for Family Research Council *et al.* as *Amicus Curiae* Supporting Appellee at 10; *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) (Nos. 06-969 & 06-970) ("[V]ery few nonprofits ever qualify as *MCFL* organizations under [the FEC's] draconian rules.").

Therefore, comparing the costs of compliance with the 2003 regulation for *qualified* non-profit corporations with the *predictive* costs of compliance for groups who, post *WRTL II*, were then permitted to speak is comparing apples to oranges. The fact that during the 2003 rulemaking the FEC rejected cost and burden concerns from *qualified* non-profits (Opp'n. Br. 20) is irrelevant. The burdens and costs of disclosure are not as substantial for *qualified* non-profits as they are for regular non-profit corporations that accept corporate contributions and grants. (JA-153-54).

Given this, the FEC had the discretion to adapt its rules to the post-*WRTL II* world. *See Rust*, 500 U.S. at 186-87. The FEC's predictive judgment was based on the uncontroverted evidence supplied to it. (JA-153 n.8, 163, 206, 311). That judgment is entitled to deference and it should be upheld. (*supra* at 17).

The FEC made a prediction based on the evidence supplied by the commenters. (HLF Br. 47). The FEC made a rational connection between the facts found—disclosure broader, burdensome, and more costly than that required by other government agencies—to the choice it made—a disclosure provision that paralleled the independent expenditure disclosure provision. (JA-311, 311 n.22). The FEC therefore satisfied its burden. *See Bowman Transp., Inc. v. Arkansas- Best Freight, Inc*., 419 U.S. 281, 285-86 (1974); *See Nuvio Corp.* 473 F.3d at 306-07;  *Sorenson Communications Inc.*, 755 F.3d at 708.

### III.   THE SEPARATE SEGREGATED FUND IS NOT A VIABLE OPTION.

Appellee claims that the FEC *failed* to explain why the separate segregated fund is not a viable option. (Opp'n. Br. 55). Rather, the labor union comment— representing 15 million members and 60 organizations— contended that the segregated bank account was not a "meaningful alternative" because it undermines *WRTL II*'s holding that the labor union could use its general treasury funds to make electioneering communications. (JA-163). The FEC credited the labor unions' comment. (JA-311) (HLF Br. 34 and 52). Furthermore, the FEC has a duty to enact regulations that do not unnecessarily offend the First Amendment. *AFL-CIO v. FEC*, 333 F.3d 168, 179 (D.C. Cir. 2003). Imposing separate segregated fund burdens on committees whose major purpose is not the election or defeat of candidates is unconstitutionally burdensome.  *See MCFL*, 479 U.S. at 252-54; *Citizens United v. FEC*, 558 U.S. 310, 337-38 (2010). (HLF Br. 52). The government cannot impose a prohibitive burden as the price for exercising First Amendment rights. *See Citizens United*, 558 U.S. at 351.

Appellee again relies on the 2003 Regulation to criticize the FEC for "[i]gnor[ing]" the separate segregated fund option "without explanation." (Opp'n. Br. 55). As is noted *supra*, the FEC did not ignore the separate segregated fund option, it simply credited the labor unions' concerns that it was not a 'meaningful

20

alternative' (JA-311). The FEC was required to recalibrate its disclosure regime to adapt to this new "complicated situation," *Van Hollen*, 694 F.3d at 111, where entities who could not previously speak could now make electioneering communications.

## IV. THE COMMISSION SOUGHT TO PRESERVE THE CONSTITUTIONALITY OF THE STATUTE.

Appellee is incorrect when he states that "The Commission did not cite the First Amendment as a reason for adopting the purpose requirement." (Opp'n. Br. 57). In fact, the FEC did state that the purpose requirement ensured that the regulation was "narrowly tailored to address" the many commenters' concerns about donor privacy. (JA-301) *see also* (JA-154); (HLF Br. 35). First Amendment regulations must be narrowly tailored and must not needlessly infringe First Amendment rights. *AFL-CIO*, 333 F.3d at 179; *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014).

Rather than address the substance of HLF's constitutional arguments, (HLF Br. 57-59), Appellee, like the district court (JA-427 n.9, 449), contends that First Amendment concerns are foreclosed to the FEC because of the Supreme Court's decisions in *McConnell* and *Citizens United*. (Opp'n. Br. 58). Although true that *McConnell* and *Citizens United* upheld the electioneering communication disclosure statute (and the implementing regulations referenced in *Citizens United*), in its opening brief, HLF demonstrated that what the Supreme Court said in *McConnell*

and *Citizens United* is not necessarily what Appellee believes it says. *See* (HLF Br. 40-41). In fact, the *McConnell* interveners and sponsors informed the court that the disclosure provision imposed the same requirements as those imposed for independent expenditures. (*Supra* at 6-7). The Supreme Court followed, holding that the electioneering communication disclosure requirements are "comparable" to the independent expenditure disclosure requirements. *McConnell*, 540 U.S. at 196-97 and n.81 (relying on *Buckley*'s approval of the independent expenditure disclosure provision to uphold BCRA's electioneering communication disclosure provision).

Then, in determining the constitutionality of the electioneering communications disclosure statute, the district court in *Citizens United* understood the statute to contain a purpose element. *See Citizens United v. FEC*, 530 F. Supp. 2d 274, 280 (D.D.C. 2008) (three-judge court) (HLF Br. 40-41). On direct appeal to the Supreme Court, the Solicitor General advised the Court that the electioneering disclosure provision required the disclosure of "[a]ny large contributions *earmarked* to underwrite it." Brief for Appellee at 30, 39; *Citizens United v. FEC*, 558 U.S. 310 (2010), No. 08-205 (emphasis added). The Supreme Court then said that the statute only required disclosure of "certain" contributors. *Citizens United*, 558 U.S. at 367-68. The Supreme Court did not elaborate any further.

HLF presents these facts to refute the notion that the Supreme Court has blessed Appellee's wish that the disclosure statute demands broader disclosure than

what is required of independent expenditures, speech that is electoral by definition. (HLF Br. 56). The Supreme Court has said no such thing and, in fact, the Government told the Court that the provision paralleled the independent expenditure disclosure statute. The FEC's interpretation is therefore reasonable.

## CONCLUSION

For the foregoing reasons, and the reasons articulated in HLF's opening brief, this Court should reverse the district court's judgment. HLF adopts CFIF's opening and reply briefs under Fed. R. App. P. 28(i).

Dated:  May 26, 2015                     Respectfully submitted,

                                          _____ /s/ Jason Torchinsky _____
                                          Jason Torchinsky (D.C. Bar No. 976033)
                                          jtorchinsky@hvjlaw.com
                                          Michael Bayes (D.C. Bar No. 501845)
                                          jmbayes@hvjlaw.com
                                          Shawn Toomey Sheehy
                                          ssheehy@hvjlaw.com
                                          HOLTZMAN VOGEL JOSEFIAK PLLC
                                          45 North Hill Drive
                                          Suite 100
                                          Warrenton, VA 20186
                                          Tel: (540) 341-8808
                                          Fax: (540) 341-8809

                                          *Counsel for Hispanic Leadership Fund*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitations set forth in this Court's February 26, 2015 order because it contains <u>4,923 words</u>, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in <u>Times New Roman 14-point font</u>.

<u>/s/ Jason Torchinsky</u>
Jason Torchinsky

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2015, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

Dated:   May 26, 2015                    Respectfully submitted,


                                          /s/ Jason Torchinsky

                                         Jason Torchinsky (D.C. Bar No. 976033)
                                         jtorchinsky@hvjlaw.com
                                         HOLTZMAN VOGEL JOSEFIAK PLLC
                                         45 North Hill Drive
                                         Suite 100
                                         Warrenton, VA 20186
                                         Tel: (540) 341-8808
                                         Fax: (540) 341-8809

                                         *Counsel for Hispanic Leadership Fund*

26